# UNITED STATES COURT OF APPEALS

## FOR THE EIGHTH CIRCUIT

No. 02-3137

Jacqueline Tuggle,

    Plaintiff - Appellee,

v.

Tom Mangan,

    Defendant - Appellant,

Missouri Highways and
Transportation Commission,

    Defendant.

Appeal from the United States
District Court for the
Western District of Missouri.

### JUDGMENT

This appeal from the United States District Court was submitted on the record of the district court, briefs of the parties and was argued by counsel.

After consideration, it is hereby ordered and adjudged that the judgment of the district court in this cause is reversed in accordance with the opinion of this court.

(5172-010199)

November 6, 2003

ORDER ENTERED IN ACCORDANCE WITH OPINION

*Michael E. Gans*

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: *Michael E. Gans*

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 02-3137

| | |
|---|---|
| Jacqueline Tuggle, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * Appeal from the United States |
| v. | * District Court for the Western |
| | * District of Missouri. |
| Tom Mangan, | * |
| | * |
| Defendant - Appellant, | * |
| | * |
| Missouri Highways and Transportation | * |
| Commission, | * |
| | * |
| Defendant. | * |

Submitted: February 14, 2003

Filed: November 6, 2003

Before LOKEN,[1] RILEY, and SMITH, Circuit Judges.

RILEY, Circuit Judge.

Jacqueline Tuggle (Tuggle) sued her employer, Missouri Highways and Transportation Commission (MHTC), for sexual harassment, disparate treatment sex

---

[1] The Honorable James B. Loken became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2003.

discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and the Equal Pay Act of 1963, 29 U.S.C. § 206(d). Tuggle also sued her supervisor, Tom Mangan (Mangan), in his individual capacity, under 42 U.S.C. § 1983 (1) for sex discrimination and sexual harassment in violation of (a) Title VII, and (b) the Equal Protection Clauses of the Fifth and Fourteenth Amendments, and (2) for retaliation in violation of the First Amendment. The district court granted summary judgment to MHTC and Mangan on all claims except Tuggle's hostile work environment sexual harassment claims against MHTC for violating Title VII and against Mangan for violating the Fourteenth Amendment. After the district court denied Mangan qualified immunity on the hostile work environment claim, Mangan brought this interlocutory appeal. Because we conclude Mangan is entitled to qualified immunity, we reverse.

I. BACKGROUND

For purposes of a qualified immunity interlocutory appeal, we view the facts in the light most favorable to Tuggle, as the district court did. At the outset, we will provide Tuggle's summary of the conduct she contends amounted to a submissible hostile work environment claim: "(1) discriminatory work assignments, (2) deprivation of training in electrician duties, (3) demeaning gender-related comments and unwanted advances, (4) humiliating photograph and jokes about her rear-end, and (5) retaliatory acts that perpetuated the hostile environment such as causing Tuggle to become caked in oil immediately prior to meeting with management."

A. Factual Summary

On April 15, 1997, the Missouri Department of Transportation (MoDOT)[2] hired Tuggle as a seasonal employee and the first and only female to work in the District 5 signal shop. Tuggle's application indicated she was interested in repairing electronic equipment, data entry, computer programming, and traffic signals. Mangan

---

[2]MoDOT operates under MHTC.

was her immediate supervisor from her date of hire until December 1999. As a seasonal employee, Tuggle spent 80% of her time working on radios and 20% doing paperwork. Just after starting as a seasonal employee, Mangan asked Tuggle to view traffic signals and streetlights with him at night, a request he never made to male employees.

On August 1, 1997, Tuggle was hired as a full-time Assistant Signal and Lighting Electrician, which required Tuggle to assist signal and lighting electricians in performing duties "related to the maintenance and repair of traffic lights, traffic signals and/or mobile radio equipment." In her new position, Tuggle spent 33% of her time installing radios, 25% working on signals and lights, and 42% doing paperwork. Some of the office work Tuggle performed was consistent with her stated interests on her application. However, Tuggle felt she was not receiving as much experience on the road as the male employees. Tuggle maintains the office work precluded her from cross-training as a permit inspector. A new male employee was allowed to cross-train as a permit inspector, and Tuggle believes the stated reasons for denying her an opportunity to cross-train, i.e., (1) she had not learned her job well enough, and (2) the number of employees at the signal shop was inadequate to complete the work without her, were actually based on gender discrimination.

Tuggle recounts a number of comments Mangan made from the time she was hired as a seasonal employee, but does not provide specific dates when the comments occurred. Because we cannot discern exactly when Mangan allegedly made these comments over a two-year period, we will simply recite them here. Mangan told Tuggle "women are better secretaries" and he wished Tuggle could be his personal secretary. Mangan asked Tuggle why she did not do her hair, wear make-up, or wear a dress to work. Mangan also commented once about Tuggle's fake fingernails. During a performance review, Mangan told Tuggle she was "good at office work," she was a "good secretary," women were better at organizing things, and it was hard for him to let her go out on the road. Mangan once asked Tuggle if she was pregnant

-3-

after she vomited and asked to go home. On one occasion, after Mangan told Tuggle she needed to respond to a call, and Tuggle replied someone would need to pick up her son, Mangan stated, "you have to choose between your job or your family."

On March 24, 1999, Mangan twice handed Tuggle a shovel and said she needed the exercise more than he. On March 25, 1999, Tuggle saw one photograph of herself in jeans leaning into a truck, and another photograph of herself in the truck facing the camera. The photograph of Tuggle from behind, which showed her clothed rear end, may have been posted on a bulletin board in the shop. Mangan's position required him to photograph employees working. Mangan had taken photographs of male employees bending over as well.

In May 1999, Tuggle told Mangan during a performance review she wanted to go out on the road more. To get that opportunity, Mangan told Tuggle she would have to take some initiative and clean the shop and a male employee's truck, stating "the guys didn't need to come into a dirty shop every day." Tuggle claims she wrote notes on the performance review form about what was said, but Mangan took the form and replaced it with a new form before returning the performance review to her. On the typewritten evaluation dated June 3, 1999, Mangan wrote Tuggle "meets expectations," which qualified her for a raise or promotion.

On June 15, 1999, Tuggle complained to Trent Brooks (Brooks), Mangan's supervisor, about some of Mangan's comments, the photograph, and that she was spending too much time in the office. Tuggle also complained to Wally Campbell (Campbell), Brooks's supervisor. After her complaint, Tuggle, Mangan, and Brooks met monthly to discuss ways to allow Tuggle to get on the road and out of the office. Tuggle believed she was being punished by having to attend these meetings. After Tuggle complained, Mangan required Tuggle and another employee to change the oil in a truck, which resulted in Tuggle being covered in oil. Even though electricians were required to change oil in the trucks, Tuggle alleges Mangan's forcing her to

-4-

change the oil was retaliation, as was his failure to inform her she could wear coveralls when changing oil.

On June 21, 1999, Brooks and Campbell told Mangan his comments were inappropriate, and he should use better judgment when photographing workers. On June 24, 1999, a meeting with signal shop employees was held to discuss the photograph and MoDOT's sexual harassment policy. Tuggle left the meeting early and believes her co-workers treated her differently after that, but does not know if Mangan said anything derogatory about her during the meeting. On July 20, 1999, Campbell discussed the Zero Tolerance Policy on sexual harassment with the signal shop employees.

On August 12, 1999, Tuggle complained to Human Resources Manager, Tom Neubauer (Neubauer), who began an investigation. However, on August 24, 1999, Tuggle filed an internal grievance with MoDOT's Director of Employee Relations, which procedurally forced Neubauer to end his investigation. After filing her grievance, Tuggle stopped doing office work completely. By November 1999, Tuggle was on the road all the time. After August 1999, Mangan made no comments regarding Tuggle's appearance or that women were better secretaries, never asked her to clean the shop, and took no more photographs of her. Apparently, the only comments Mangan made to her were for her to show another employee how to clean the bathroom, and he asked if she bought furniture on the state credit card. After Tuggle filed her grievance, Mangan sent Tuggle and another employee to perform maintenance on a signal, which had already been done. Tuggle claims this was retaliation. Mangan also told Tuggle to change a mercury relay, but Tuggle said she had not been trained to do that, so Mangan told her just to perform maintenance on it. Tuggle was not in the office the next morning when Mangan sent two employees to change the mercury relay, and Tuggle claims this was retaliation as well.

Case 2:00-cv-04182-NKL    Document 171    Filed 12/04/03    Page 6 of 15

On November 8, 1999, Employee Relations informed Tuggle that Mangan was disciplined for questionable comments and behavior, but she had not been subjected to discrimination based on sex, unwelcome sexual harassment or retaliation. On November 17, 1999, Tuggle filed discrimination charges with the Equal Employment Opportunity Commission and state counterpart. On November 18, 1999, Tuggle applied for a Senior Signal and Lighting Electrician position, stating she met the required education and experience qualifications. In December 1999, two Signal and Lighting Electricians were promoted to Senior positions. In June 2000, Tuggle was promoted from Assistant Signal and Lighting Electrician to Signal and Lighting Electrician. On October 11, 2000, Tuggle filed her federal lawsuit against MHTC and Mangan.

**B.     Procedural Summary**

The district court granted summary judgment to Mangan on Tuggle's Title VII and Fifth Amendment equal protection claims, because the claims do not apply in this section 1983 case. The district court also granted summary judgment to Mangan and MHTC on the disparate treatment claims. To support Tuggle's disparate treatment theory, Tuggle claimed she had been assigned secretarial, housekeeping and janitorial duties, denied training opportunities for electricians, denied an opportunity to cross-train to become a permit inspector, denied promotion opportunities, and suffered wage discrimination. The district court noted Tuggle received the same pay and benefits, was qualified for the Senior Signal and Lighting Electrician position, and was promoted to Signal and Lighting Electrician at the first opportunity. Thus, the district court concluded Tuggle had not suffered an adverse employment action, because she suffered no material changes in the terms or conditions of her employment. Specifically, the district court stated that, "[u]nder these circumstances, Tuggle merely experienced dissatisfaction with her work assignments and training, not a material change in employment necessary to prove an adverse employment action. Therefore, no reasonable juror could find Tuggle suffered an adverse employment action."

Tuggle claimed Mangan retaliated against her in violation of the First Amendment by making Tuggle change the oil in the truck, holding the sexual harassment meeting after Tuggle left, forcing Tuggle to perform maintenance on a light when it had already been done, and depriving Tuggle of an opportunity to learn how to change a mercury relay. The district court determined none of these acts amounted to an adverse employment action. Tuggle also claimed she was denied a promotion to the Senior Signal and Lighting Electrician position, denied the cross-training opportunity to become a permit inspector, and was forced to attend remedial training in front of other employees. The district court recognized Mangan had no personal involvement in these decisions. Because Mangan was not involved in some of these actions and Tuggle did not suffer an adverse employment action, the district court granted summary judgment to Mangan on the retaliation claim.

Tuggle's hostile work environment sexual harassment claims against MHTC under Title VII, and against Mangan under section 1983, were the only claims to survive summary judgment. The district court first summarized Mangan's conduct at the heart of Tuggle's sexual harassment claim, "which occurred over a period of more than two years: 1) comments regarding her clothing, makeup, hair, and fingernails, her need for exercise, and the possibility that she was pregnant; 2) comments regarding her secretarial and organizational abilities; 3) asking her to view streetlights with him at night; 4) taking a photograph of her rear end and possibly posting it on the bulletin board." In deciding Tuggle presented a submissible hostile work environment sexual harassment case, the district court noted "[t]hese comments and incidents may appear to be innocent and isolated at first, but coupled with the evidence Tuggle has produced regarding her discriminatory work assignments, they are sufficient to make a submissible case on Tuggle's hostile work environment [claim]." Finally, the court decided that "Mangan's harassment, coupled with Tuggle's discriminatory work assignments, affected a term, condition, or privilege of her employment. Therefore, a reasonable jury could conclude that Mangan's offensive comments, in combination with his decision to assign Tuggle to paperwork

and cleaning duties rather than to let her go out on the road, was [sic] sufficient to create a hostile work environment based on gender."

The court then addressed Mangan's qualified immunity defense to Tuggle's hostile work environment sexual harassment claim based on Mangan's conduct and work assignments. In denying Mangan's qualified immunity defense, the district court stated the law was clearly established at the time Mangan acted that intentional sexual harassment by a person acting under color of state law violated the Fourteenth Amendment, citing <u>Jones v. Clinton</u>, 990 F. Supp. 657, 668 (E.D. Ark. 1998).

## II. DISCUSSION
### A. Jurisdiction/Standard of Review

As an initial matter, Tuggle argues our court has no jurisdiction to hear this appeal because the appeal involves factual disputes. For appeal purposes, we resolve any factual disputes in Tuggle's favor, and review the district court's denial of Mangan's assertion of qualified immunity as a pure question of law. A denial of qualified immunity is immediately appealable. <u>Hawkins v. Holloway</u>, 316 F.3d 777, 781 (8th Cir. 2003). We review the denial of qualified immunity de novo. <u>See</u> <u>Collins v. Bellinghausen</u>, 153 F.3d 591, 595 (8th Cir. 1998).

### B. Qualified Immunity

Qualified immunity generally shields state actors from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity "is an *immunity from suit* rather than a mere defense to liability," which "is effectively lost if a case is erroneously permitted to go to trial." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985). In resolving this qualified immunity dispute, we must ask two questions. The threshold question is whether the facts, viewed in the light most favorable to Tuggle, show Mangan's conduct violated a federal constitutional or statutory right. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

-8-

If Tuggle's submissions show Mangan could have violated a constitutional or statutory right, then "the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." Id.

### 1. Violation of a Constitutional Right

Under the first prong of the qualified immunity analysis, we must determine whether the facts, when viewed in Tuggle's favor, establish a violation of a constitutional right. Id. Tuggle contends Mangan's harassing comments and photograph, when combined with her work assignments, lost training opportunities, and Mangan's retaliatory acts, were of constitutional proportions.

Sexual harassment by state actors violates the Fourteenth Amendment and establishes a section 1983 action. Moring v. Ark. Dep't of Corr., 243 F.3d 452, 455 (8th Cir. 2001). To prevail on her hostile work environment sexual harassment claim, Tuggle must prove "that she was a member of a protected group, that she was subjected to unwelcome sexual harassment, that the harassment was based on sex, and that the harassment affected a term, condition, or privilege of her employment." Duncan v. GMC, 300 F.3d 928, 933 (8th Cir. 2002) (Title VII) (quoting Beard v. Flying J, Inc., 266 F.3d 792, 797-98 (8th Cir. 2001)); Moring, 243 F.3d at 455 (same elements for section 1983 claim). To be actionable, the alleged harassment must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (citation and quotation omitted). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Sexual harassment "standards are demanding–to be actionable, conduct must be extreme and not merely rude or unpleasant." Alagna v. Smithville R-II Sch. Dist., 324 F.3d 975, 980 (8th Cir. 2003). "More than a few isolated incidents are required," and the alleged harassment must be "so intimidating, offensive, or hostile that it

-9-

poisoned the work environment." Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999) (citations and quotations omitted); see also Duncan, 300 F.3d at 934 ("To clear the high threshold of actionable harm, [the plaintiff] has to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult.'" (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Determining whether a work environment is hostile or abusive depends on all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

In deciding whether Tuggle's sexual harassment claim clears the high threshold of actionable harm, we must compare Mangan's conduct to the harassing conduct discussed in other cases. Last year, this court decided more egregious misconduct did not constitute sexual harassment. See Duncan, 300 F.3d at 935. In Duncan, our court reversed a million dollar judgment awarded to a plaintiff in a sexual harassment/constructive discharge case, concluding "as a matter of law that [the plaintiff] did not show a sexually harassing hostile environment sufficiently severe or pervasive so as to alter the conditions of her employment, a failure that dooms [her] hostile work environment claim." Id. The facts of Duncan are worth describing in detail, because Mangan's harassing conduct was not as extreme.

In August 1994, Diana Duncan began working at GMC. Two weeks after starting her new job, a manager made a sexual advance toward her, which she rebuffed. After the rebuff, the manager criticized Duncan's work and told her she was incompetent. The manager then ordered Duncan to use his computer to complete a task, and the computer's screen saver depicted a naked woman. The manager also unnecessarily touched Duncan's hand on four or five occasions. The manager had a planter in his office shaped like a man. The planter had a hole in the front of the man's pants with a cactus protruding out. The manager also twice showed Duncan

-10-

a pacifier shaped like a penis. In 1995, Duncan requested a pay increase and asked to be considered for an illustrator's position. The manager ordered her to prove her artistic ability by drawing his planter, even though other workers were required to draw automotive parts. Also in 1995, the manager and another employee created a recruitment poster and posted it on a bulletin board. The poster portrayed Duncan as president and CEO of the Man Hater's Club of America. The club's qualifications included being in control of, among other things, sex. In April 1996, the manager had Duncan arrested as part of a charity event. After bailing her out with a financial donation, the manager took Duncan to a bar over her protestations. In May 1997, the manager asked Duncan to type a draft of the beliefs of the He-Men Women Hater's Club, which included repealing women's right to vote, that women have "coodies [sic] and they can spread, Women [are] the cause of 99.9 per cent of stress in men, Sperm has a right to live, All great chiefs of the world are men, [and] Prostitution should be legalized." Id. at 932. Duncan refused to type the beliefs and resigned. Our court determined the manager's "actions were boorish, chauvinistic, and decidedly immature, but we cannot say they created an objectively hostile work environment permeated with sexual harassment." Id. at 935.

In this case, the district court rejected Tuggle's disparate treatment claim, deciding "Tuggle merely experienced dissatisfaction with her work assignments and training, not a material change in employment necessary to prove an adverse employment action." See also Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997) (citation omitted) (stating "not everything that makes an employee unhappy is an actionable adverse [employment] action"); Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 555 (5th Cir. 1997) ("Undesirable work assignments are not adverse employment actions."). After determining Mangan's comments were innocent and isolated, the district court then coupled the sexual harassment allegations with the disparate treatment allegations to conclude Tuggle

-11-

Case 2:00-cv-04182-NKL    Document 171    Filed 12/04/03    Page 12 of 15

presented a submissible hostile work environment sexual harassment claim.[3] Because Mangan's conduct was not so severe or pervasive as to alter the terms and conditions of Tuggle's employment, we conclude Tuggle has not presented a submissible hostile work environment sexual harassment claim.

Tuggle was clearly subjected to harassing conduct, but not the kind of actionable conduct that constitutes a constitutional violation. We wholly agree with the district court that the comments and the photograph incident (harassing conduct), which apparently occurred over a two-year period, were not so severe or pervasive as to poison her work environment. The undesirable work assignments admittedly did not affect her advancement opportunities and did not constitute adverse employment actions. We do not believe combining these allegations transformed the work environment, as a whole, into one so extreme as to change the terms and conditions of her employment, such that Tuggle was prevented from succeeding in the workplace. See, e.g., Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 874 (5th Cir. 1999) (holding the "harassing actions, although offensive, are not the type of extreme conduct that would prevent [the plaintiff] from succeeding in the workplace"); DeNovellis v. Shalala, 124 F.3d 298, 311 (1st Cir. 1997) (holding scattered comments showing race, ethnicity and age-based animus combined with "employment purgatory" of job assignments below the plaintiff's qualifications were not severe or pervasive to constitute sexual harassment); Southard, 114 F.3d at 555 (holding harasser's slamming doors, staring at plaintiff, stating plaintiff might be his personal secretary, and giving unreasonable work assignments to plaintiff were not so severe or pervasive as to constitute sexual harassment). But cf. Casiano v. AT&T Corp., 213 F.3d 278, 285 (5th Cir. 2000) (calling plaintiff "honey" and assigning him

---

[3] We are somewhat confused by the district court's label of discriminatory job assignments in its sexual harassment discussion, since the court had determined the work assignments did not constitute disparate treatment sex discrimination, and Tuggle had not suffered an adverse employment action or a material change in the terms and conditions of her employment.

-12-

Case 2:00-cv-04182-NKL    Document 171    Filed 12/04/03    Page 13 of 15

demeaning tasks not sexual harassment, but harassment became severe and pervasive when combined with multiple incidents of sexual misconduct).

Although Mangan's conduct was inappropriate, it did not rise to the level of actionable hostile work environment sexual harassment. Our conclusion is consistent with <u>Duncan</u> and other recent circuit cases requiring hostile work environment claims to satisfy the demanding standards established by the Supreme Court in order to clear the high threshold for actionable harm. <u>See</u>, <u>e.g.</u>, Ottman v. City of Independence, 341 F.3d 751, 760 (8th Cir. 2003) (section 1983); <u>Alagna</u>, 324 F.3d at 981 (Title VII); <u>Duncan</u>, 300 F.3d at 935 (Title VII); <u>Scusa</u>, 181 F.3d at 966-67 (Title VII). But <u>cf.</u> <u>Moring</u>, 243 F.3d at 456-57 (conduct <u>severe</u> enough to support jury verdict for sexual harassment); <u>Mems v. City of St. Paul</u>, 224 F.3d 735, 738-39 (8th Cir. 2000) (conduct sufficiently severe or pervasive to create a submissible hostile work environment claim).

### 2. Clearly Established Right

The district court also concluded the right Tuggle asserts was clearly established at the time of Mangan's conduct. Mangan argues the district court's coupling of failed disparate treatment and sexual harassment theories into a submissible hostile work environment claim was not clearly established at the time of the alleged conduct to give fair warning to Mangan that his conduct was unconstitutional. <u>See</u> Hope v. Pelzer, 536 U.S. 730, 740-41 (2002). Because we have decided the facts alleged do not constitute hostile work environment sexual harassment in violation of Tuggle's constitutional rights, we need not address the interesting question of whether using the coupling of theories was clearly established at the time of Mangan's conduct.

### III. CONCLUSION

We conclude Tuggle has failed to establish Mangan violated her constitutional rights because his conduct was not so severe or pervasive to constitute hostile work

-13-

Case 2:00-cv-04182-NKL   Document 171   Filed 12/04/03   Page 14 of 15

environment sexual harassment. Because Mangan is entitled to qualified immunity, we reverse the district court's denial of summary judgment to Mangan.

---

A TRUE COPY OF THE ORIGINAL
MICHAEL E. GANS, CLERK
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
BY: *Michael E. Gans*